**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Paul E. DAVIS, Defendant-Appellant.**

**No. 84–1152.**

United States Court of Appeals, Fifth Circuit.

Jan. 25, 1985.

Rehearing Denied Feb. 25, 1985.

Jay Ethington, Thomas D. Glenn, Dallas, Tex., for defendant-appellant.

James A. Rolfe, U.S. Atty., Jack C. Williamson, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before THORNBERRY, GARWOOD, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Paul Davis was convicted of making false statements to a federally insured bank, mail fraud, and obstruction of justice. His appeal challenges the sufficiency of the evidence to support his conviction on all counts. In addition, Davis contends that the obstruction counts should have been severed from the other charged offenses; that he was denied due process as a result of the trial court's alleged antagonism and hostility; and that error resulted from the withholding of *Brady* material by the government. For the reasons that follow, we affirm.

This is an appeal from a jury trial in which Davis was charged with three counts of making false statements to a federally insured bank in violation of 18 U.S.C. § 1014, two counts of mail fraud in violation of 18 U.S.C. § 1341, and two counts of obstruction of justice in violation of 18

U.S.C. § 1503. The first three counts involved Davis' misrepresentations to federally insured banks that trucks, used as collateral for loans made to him, in fact existed. The mail fraud violations involved the use of the mails to transmit loss notices involving the trucks and insurance payments for their loss. The obstruction of justice counts involved Davis' failure to produce documents requested pursuant to a federal grand jury subpoena and Davis' alleged attempts to interfere with a witness in the proceeding against him.

The jury returned a verdict of guilty on all counts. Davis was sentenced to two year terms of imprisonment on each count, with sentences on counts 1, 2 and 3 to run concurrently, and sentences on counts 4, 5, 6 and 7 to run concurrently but consecutive to the sentence on the other counts. In addition, he was fined $5,000 on the first count. Davis has duly perfected this appeal.

### I. *Facts*

The primary evidence relied upon by the government to prove the false statement and mail fraud counts consisted of the testimony of Curtis Hill and Cub Dillard.[1] Hill testified that during the years 1980–1982 he operated a scheme to defraud insurance companies. In general, the scheme consisted of creating false titles and other documentation for trucks that did not exist and using these documents to obtain bank loans with the nonexistent trucks as collateral. The trucks were insured and later reported to the insurance companies as having been stolen. The insurance companies then paid the bank loans off directly with the proceeds of the insurance policy. Under the workings of

the scheme, the perpetrator of the fraud would retain the proceeds of the bank loan.

During the early part of 1980, Hill had a discussion with Davis in which Hill asked Davis if he knew of any way to acquire a blank manufacturer's statement of origin certificate (MSO).[2] Hill testified that in April 1980, he purchased two blank MSOs from Davis for ten thousand dollars. After describing a fictitious vehicle on each MSO, Hill then obtained titles and registrations from the State of Texas. These documents were then delivered to a financial institution from which a loan on each vehicle was obtained. Hill testified that he produced documentation that would verify, for the purpose of obtaining insurance, the purchase of the vehicle. Hill wrote a check to a fictitious "seller" who cashed the check and then returned the money. Hill then had the cancelled check to verify the existence of the vehicle, to prove that he had bought it and to establish its value. He then reported the loss by theft of the vehicle to the insurance company and furnished proof of loss. Payment of insurance benefits to the bank was then made by the insurance company in satisfaction of the loan.

Later in 1980, Davis approached Hill and asked for help in his own insurance fraud scheme. He requested that Hill supply him with an MSO for a truck that did not exist. Davis also asked Hill to orally verify the sale of the truck to him should an insurance company agent ever ask Hill about it. Davis then used the document he got from Hill to obtain a bank loan. In 1981, through use of the mail, Davis reported to his insurance company that the truck had been stolen; the insurance company by

---

1. At the time of his testimony, Hill was, and still is, serving a twelve-year sentence on a plea of guilty to charges of mail fraud and making false statements to a federally insured bank arising out of the same transactions involved in this case. Part of the plea bargain agreement required Hill to testify for the government against Davis. Dillard also entered into an agreement with the government wherein he agreed to testify against Davis in exchange for immunity from prosecution based on these same transactions.

2. An MSO is a document generated by the manufacturer that is produced for each new vehicle that is built which contains the year of manufacture, make, model, and vehicle identification number. The original purchaser of the vehicle uses an MSO to obtain a title to and registration of the vehicle from the State.

mail then paid to the bank the balance due on the bank loan.

In the spring of 1982, Davis again approached Hill, asking for two fake MSOs. Hill supplied Davis as requested and Davis used the MSOs to obtain loans from two other banks. Davis also reported these trucks stolen, mailed loss notices and filed claims with the insurance company. These claims were eventually paid by mail with the proceeds going directly to the banks in order to pay off the loans purportedly used to purchase the trucks. The foregoing facts form the basis for counts one, two and three charging false statements to a federally insured bank in connection with the loans and for counts four and five charging mail fraud in connection with the insurance claims and payments.

On November 2, 1982, pursuant to a general investigation of Hill and other persons involved in insurance and bank fraud schemes in the Dallas area, a grand jury subpoenaed Davis and ordered him to appear before it on November 30, 1982. Davis was also ordered to bring with him documents from April 1, 1978, to the date of the subpoena regarding relations and transactions between his company, Paul Davis Wholesale Trucks, Inc., and Curtis Hill or his companies, Dal-Tex Motors, Inc., or Oil Patch Equipment Company. Davis appeared, as ordered, but claimed that he had been unable to locate any relevant documents. The grand jury allowed him further time to complete his search, and reset the appearance date to January 11, 1983. On that date Davis appeared, and he again reported that his search had failed to locate any documents relevant to the subpoena.

About September 7, 1983, pursuant to a "reciprocal" discovery agreement between the government and Davis' defense counsel, H. Jay Ethington, Agent Foster of the United States Secret Service examined Ethington's files relating to Davis. There Foster found documents that had been subpoenaed by the grand jury, but which were never produced by Davis. At the trial, Dillard, a former employee of Davis, testi-

fied that these documents had been removed from Davis' office to his house immediately after Davis became aware of an investigation. Davis' failure to comply with the subpoena forms the basis for count six charging obstruction of justice.

Prior to trial, Dillard agreed to cooperate with the Secret Service in their prosecution of Davis. About this time Dillard began receiving telephone calls from Davis. On the morning of September 8, 1983, one of these calls was taped by the government; it recorded a conversation in which Davis sought to meet with Dillard in order to inform him what he (Davis) planned to say at the trial, and what he wished Dillard to say. Shortly after this phone call, on the same day, Davis visited Dillard's home to talk further with him. The phone conversation and the subsequent in-person conversation between Davis and Dillard form the basis for count seven also charging obstruction of justice.

## II. *Sufficiency of the Evidence*

■ Davis challenges the sufficiency of the evidence to sustain his convictions for making false statements to federally insured banks, for mail fraud and for obstruction of justice. The appropriate standard of review for such a contention is whether a "reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Aguirre Aguirre*, 716 F.2d 293, 297 (5th Cir.1983). Because it is the sole province of the jury to weigh the evidence and the credibility of the witnesses, an appellate court cannot rebalance that assessment of credibility. Therefore, the appropriate question as to sufficiency of the evidence is to ask merely whether there exists in the record substantial evidence in support of the jury's finding. *United States v. Niver*, 689 F.2d 520, 529 (5th Cir.1982). "In making that determination, this Court must view the evidence and all reasonable inferences which may be drawn therefrom, in the light most favorable to the government." *Aguirre Aguirre, supra*, at 297 (citing *Glasser v. United States*, 315 U.S.

60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)).

### A. False Statement Counts

Davis challenges the sufficiency of the evidence to support his convictions for making false statements to federally insured banks under 18 U.S.C. § 1014. He contends that the evidence was insufficient to show that the banks were influenced by the purported existence of the trucks in granting him the loans. Rather, he argues, the evidence reveals that his good relationships with the banks, his spotless credit history and his substantial and unutilized line of credit influenced the banks' decisions to extend the loans to him. Even if we were to agree with Davis' statement of the facts, we do not agree with his interpretation of the law required to support his conviction under these facts.

■ The crime outlined in § 1014, making it unlawful to make a false statement to a federally insured bank, is a statutory crime of knowing misrepresentation.[3] Recently, we stated that "the essence of a section 1014 offense is the making of the false statement with the *intent* to influence the lender, and it is not dependent upon the accomplishment of that purpose." *United States v. Shaid*, 730 F.2d 225, 232 (5th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984) (emphasis in original). It is a crime of subjective intent

that requires neither reliance by the lending institution nor an actual defrauding for its commission. *Id.* (citing *United States v. Bonnette*, 663 F.2d 495 (4th Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 666 (1982)); *see also United States v. Kennedy*, 564 F.2d 1329, 1340 (9th Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978).

■ The evidence clearly supports the implicit finding from the jury's guilty verdict on counts one, two and three that Davis knew the trucks did not exist and listed them as collateral for the purpose of influencing the loan approvals and disbursal of the loan proceeds.[4] Davis was shown to have possessed the requisite intent to influence the lender banks. Whether he succeeded in influencing the banks or whether the banks relied on the fictional trucks as collateral is immaterial. It is enough that Davis made a false statement knowingly and with the subjective intent to influence the banks "in any way." Our review of the record, with inferences most favorable to the government, adequately supports the jury's verdict on all essential elements of a § 1014 violation. Davis' conviction on the first three counts will not be overturned.

### B. Mail Fraud Counts

■ The federal mail fraud statute, 18 U.S.C. § 1341,[5] has as its purpose the con-

---

**3.** Title 18 U.S.C. § 1014 (1976), in pertinent part, states:

> Whoever *knowingly makes* any false statement or report, ... *for the purpose of influencing in any way* the action of ... [a federally insured bank or lending institution] ... upon any application, advance, ... commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both. (emphasis added).

**4.** The trial court's charge to the jury concerning the offense charged in counts one, two and three described as an essential element of the offense that:

> The Defendant made the false statement or report wilfully and with intent to influence

the action of the insured bank upon an application, advance, commitment or loan, or any change or extension thereof.

**5.** Title 18 U.S.C. § 1341 (1976), in pertinent part, states:

> Whoever, *having devised or intending to devise any scheme or artifice to defraud,* or for obtaining money or property by means of false or fraudulent pretenses, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or things whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or *knowingly causes to be delivered by mail* according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than

demnation of "any scheme to defraud in which the mails are used." *United States v. Rodgers*, 624 F.2d 1303, 1306 (5th Cir. 1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981); *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980). Mail fraud requires the proof of three elements as to the defendant, beyond a reasonable doubt: (1) the defendant's participation in some scheme or artifice to defraud; (2) the use of the mails "caused by" defendant or someone associated with the scheme; and (3) the use of the mails for the purpose of executing the scheme.[6] *Rodgers, supra*, at 1306.

Davis challenges only the sufficiency of the evidence to establish the first element of mail fraud: that he had any involvement in schemes to defraud insurance companies. He asserts that most of the testimony of Hill, the government witness, concerned Hill's own fraud schemes, and that this evidence is insufficient to connect Davis with those schemes to support his convictions for mail fraud. We disagree.

■ To establish the first element of mail fraud, the government need only adduce evidence at trial that would allow the jury to infer the existence of a fraudulent scheme or activity in which the defendant participated. *United States v. Toney*, 598 F.2d 1349, 1355–56 (5th Cir.1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). To do so it need only prove a sufficient number of fraudulent activities to support a jury inference that there was a fraudulent scheme in which the defendant had a role. *Id.* Thus, though the government may have failed to establish that Davis participated in all aspects of an insurance fraud scheme, this does not militate against the jury's presumed finding through its guilty verdicts on counts four and five that Davis devised a scheme

to defraud and participated in some aspects thereof.[7]

■ The testimony of Dillard and Hill, viewed, with all reasonable inferences to be drawn therefrom, in the light most favorable to the government, indicates Davis knew of and participated in schemes to defraud the insurance companies. Evidence that Davis obtained truck loans from three Dallas banks, reported the trucks stolen and filed claims with the insurance companies further supports the inference that Davis participated in insurance fraud schemes. Davis also argues that there was evidence that Hill forged his signature while perpetrating one of his (Hill's) schemes and this demonstrates that he was not involved in Hill's insurance fraud schemes. This contention is unavailing as we find the evidence sufficient to establish Davis' participation in his own insurance fraud scheme. Because the evidence would allow the jury to infer the existence of an insurance fraud scheme in which Davis had taken part, Davis' contention that there was insufficient evidence to convict him of the mail fraud counts is without merit.

## C. Obstruction of Justice Counts

Davis challenges the sufficiency of evidence to show that he failed or refused to produce the documents subpoenaed by the grand jury. He argues that the evidence in the record is insufficient to show he had possession of the subpoenaed documents at the time he received the subpoena on November 2, 1982. The documents were later discovered in a routine discovery examination of his defense counsel's records, some nine months after Davis' second failure to provide the grand jury with the subpoenaed documents. Davis claims that the subsequent appearance of the documents in

---

$1,000 or imprisoned not more than five years, or both. (emphasis added).

6. The two counts of mail fraud were premised upon (1) the mailing of a check from an insurance company payable to Davis' company and a bank; and (2) the mailing of two loss notices from Davis to an insurance agency.

7. The trial court's charge to the jury concerning the offense charged in counts four and five described as an essential element of the offense that:

> The Defendant willfully and knowingly devised a scheme or artifice to defraud, or for obtaining money or property by means of false pretenses, representations or promises.

his attorney's files can be explained by circumstances and events that would exonerate him from the obstruction of justice count; however, he cites no specific facts in support of this claim.

The government points out that there was testimony by Dillard that places the documents in Davis' possession at the time the fraud investigation was initiated and at the time Davis first became aware that he was a subject of the investigation; that soon thereafter the documents were removed from his office to his house; and that the documents turned up some time later in Davis' defense counsel's files. There is, therefore, enough evidence in the record to allow a reasonable jury to infer that Davis did either actually or constructively possess the documents that were the subject of the grand jury subpoena and that he failed to produce them.

■■■■ Davis offered no direct evidence which contravened this assertion or which rebutted the evidence presented by the government.[8] To overcome the jury verdict against him, it is necessary for Davis to show not only that a reasonable alternative conclusion exists but also that the verdict was unreasonable, given the evidence in the record. *See, e.g., United States v. Aquirre Aquirre*, 716 F.2d 293, 297 (5th Cir.1983). Viewing the evidence elicited from Dillard in a light most favorable to the government, we believe there is substantial evidence to support Davis' obstruction of justice conviction.

## III. *Severance*

Davis asserts error in the trial court's denial of his motion to sever the obstruction of justice counts from the false statement and mail fraud counts. He contends that joinder was improper because the ob-

struction charges grew out of "a separate set of circumstances;" moreover, he argues that severe prejudice resulted from joinder of these counts with the others. Davis further contends that his defense counsel would have been a material witness as to both obstruction counts, but could not testify without a severance of the counts.

■■■■ The standard of review of the district court's denial of Davis' motion to sever under Fed.R.Crim.P. 14 is whether the district court abused its discretion. *United States v. Forrest*, 623 F.2d 1107, 1115 (5th Cir.), *cert. denied*, 449 U.S. 924, 101 S.Ct. 327, 66 L.Ed.2d 153 (1980); *United States v. Cuesta*, 597 F.2d 903, 919 (5th Cir.), *cert. denied*, 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 377 (1979). In reviewing such a denial, the preliminary inquiry is whether, as a matter of law, initial joinder of the counts was proper under Fed.R. Crim.P. 8(a). *Forrest, supra*, at 1114.

### A. Initial Joinder

■■■■ Whether counts charging different criminal offenses may be joined in one indictment brings into play Fed.R.Crim.P. 8(a).[9] It is the view of this Circuit that "Rule 8 is to be broadly construed in favor of initial joinder." *Id.* (quoting *United States v. Park*, 531 F.2d 754, 761 (5th Cir. 1976)). Joinder under Rule 8(a) is proper where the joined charges are based on the same transaction, or are two different transactions that are connected because they are derived from the same set of circumstances. We recently stated that this inquiry may be resolved by addressing the relatedness of the facts underlying each offense.

When the facts underlying each offense are so closely connected that proof of such facts is necessary to establish each

---

**8.** Davis contends he was foreclosed from doing so by the trial court's refusal to sever the obstruction of justice counts from the false statement and mail fraud counts. These contentions are discussed in part III. B, *infra*.

**9.** Fed.R.Crim.P. 8(a) provides:

Two or more offenses may be charged in the same indictment or information in a sepa-

rate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

offense, joinder of . . . offenses is proper . . . . When there is no "substantial identity of facts or participants between the two offenses, there is no 'series' of acts under Rule 8(b)."

*United States v. Lane,* 735 F.2d 799, 804 (5th Cir.1984) (citations omitted). Davis' argument is little more than a conclusory statement that the two obstruction of justice charges and the mail fraud and false statement charges grew out of a separate set of circumstances. Our review convinces us that joinder here was proper.

Both obstruction charges grew out of Davis' attempt to avoid implication in or the detection of a fraudulent scheme. Thus, the coverup attempts bear a logical relationship to the underlying fraud crimes. *See United States v. Berardi,* 675 F.2d 894, 899 (7th Cir.1982); *United States v. Park,* 531 F.2d 754, 761 (5th Cir.1976). In *United States v. Duzac,* 622 F.2d 911 (5th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980), the joinder of a perjury count with a count charging violation of civil rights was found proper where the perjured statements were made to a grand jury investigating the underlying civil rights charge and the statements were made in an attempt to conceal defendant's involvement in the civil rights violation. In *United States v. Rajewski,* 526 F.2d 149 (7th Cir.1975), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976), the court upheld the joinder of an obstruction of justice charge with a fraud charge where concealment of the fraud was found to be the motive for the obstruction of justice. The court premised its holding upon the evidentiary overlap stating, "[t]he two facets of the evidence were mutually dependent upon and inextricably connected with one another, in spite of the fact that the evidence proving them individually was not identical." *Id.* at 155; *see also Berardi, supra,* at 900.

There was substantial overlap of the evidence to prove Davis' guilt of the various counts. Evidence of Davis' involvement in making false statements to federally insured banks and mail fraud certainly tends to establish a motive for the obstruction of justice. Similarly, evidence of Davis' failure to produce subpoenaed documents and his alleged interference with a witness in an upcoming proceeding against him would tend to establish Davis' "guilty consciousness" of the false statement and mail fraud charges. The evidentiary overlap leads us to conclude that judicial economy militates against separate trials of these counts. Accordingly, we hold, as a matter of law, that joinder of the obstruction counts with the underlying fraud counts was proper.

## B. Prejudice from Joinder

Davis argues he was entitled to a severance of the obstruction of justice counts under Fed.R.Crim.P. 14 [10] because of prejudice resulting from his not being able to offer evidence to rebut those charges. This Court has noted that "severance is not mandatory simply because a defendant indicates that he has evidence on some counts but not on others." *Forrest, supra,* at 1115; *Alvarez v. Wainwright,* 607 F.2d 683, 685 (5th Cir.1979). Consequently, a defendant seeking severance of charges because he wishes to testify as to some counts but not as to others has the burden of demonstrating "that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Forrest* at 1115; *Alvarez* at 686. The trial court must balance the prejudice to the defendant due to the absent testimony against the interest in judicial economy. The same considerations should apply where a defendant desires severance so his attorney may testify. We find that Davis has not met his burden of establishing that the properly joined

---

**10.** Fed.R.Crim.P. 14, in pertinent part, provides:
If it appears that a defendant . . . is prejudiced by a joinder of offenses . . . in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts . . . or provide whatever other relief justice requires.

charges were improperly denied severance under Rule 14.

■ Davis asserts merely that Ethington, his counsel of record at the trial, was a material fact witness to the allegations contained in the obstruction counts. Citing in his brief to no specific evidence in the record, Davis appears to argue that Ethington would have testified that Davis did not possess the relevant documents at the time of the subpoena. With respect to count 7, alleging Davis' attempt to illegally influence Dillard's testimony, Davis argues that Ethington's testimony would have clarified Dillard's status as a non-witness. Both arguments are unavailing. Davis in fact did not proffer what testimony Ethington would give regarding the subpoenaed documents if he were called as a witness. Accordingly, Davis is foreclosed from arguing the absence of Ethington's testimony as a ground of error. Fed.R.Evid. 103(a)(2); *United States v. Vitale*, 596 F.2d 688, 689 (5th Cir.1979), *cert. denied*, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979). However, even if we were to consider the issues that Davis contends are raised by the mere absence of Ethington's testimony, we nevertheless find his contentions to be lacking in any merit.

■ We are not convinced that Davis has shown substantial prejudice resulting from the lack of Ethington's testimony concerning the subpoenaed documents. Ethington was not Davis' attorney of record at the time of the grand jury subpoena. He could have testified only as to those events that led to his subsequent possession of the documents and those that took place nine months after the subpoena when Agent Foster found the incriminating documents. Moreover, while Davis failed to introduce any evidence establishing a chain of possession of the relevant documents back to the time of the subpoena, the government, through Dillard's testimony, established Davis' possession of the incriminating documents prior to and at the time of the issuance of the subpoena. Accordingly, Davis was not substantially prejudiced by the loss of Ethington's testimony.

■ Similarly, and contrary to the argument of Davis, we find no prejudice resulted from the lack of Ethington's testimony concerning Davis' attempt to influence Dillard in violation of 18 U.S.C. § 1503.[11] It is undisputed that Ethington was not present at the time Davis telephoned Dillard and later met with him. Davis argues, however, that Ethington would have established that Agent Foster had falsely stated to him that Dillard was "sitting on the fence" as far as who he was going to testify for. According to Agent Foster, this conversation took place one day after Davis contacted Dillard; Ethington's testimony, according to Davis, would have established, however, that the date of the conversation was one day prior to the date Davis contacted Dillard.

■ Davis contends that Agent Foster's remarks about Dillard's status as a witness led his attorney and himself to believe that Dillard was not yet a "witness," so that contacting him as he did was not illegal. Davis misreads the law on this point. "A 'witness' under section 1503 is one who knows or is expected to know material facts and is *expected* to testify to them or to be called on to testify." *Berardi*, 675 F.2d at 903 (emphasis added) (citing *United States v. Chandler*, 604 F.2d 972, 974 (5th Cir.1979), *cert. dism'd*, 444 U.S. 1104, 100 S.Ct. 1074, 63 L.Ed.2d 317 (1980)). This Court has indicated that whether a person is a witness for § 1503 purposes

11. Title 18 U.S.C. § 1503, in pertinent part, states:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, ... endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

In *United States v. Wesley*, 748 F.2d 962 (5th Cir.1984), we noted that Congress amended § 1503 in 1982 and removed all references to witnesses. We found no indication, however, "that Congress intended that threats against witnesses ... were exempt from prosecution under § 1503." *Id.* at 964. Thus, urging and advising a witness to testify falsely falls within § 1503.

must be determined by substance, not form. *Chandler, supra,* at 974. One may be a witness even if not yet under formal subpoena, *Id.; Odom v. United States,* 116 F.2d 996, 998 (5th Cir.1941), and whether or not the legal proceeding relevant to the "witness" status has even been commenced. *Hunt v. United States,* 400 F.2d 306, 307–08 (5th Cir.1968), *cert. denied,* 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 566 (1969). The cases speak only of "witness" status depending, not on whether the witness himself expects to testify or expects to be called, but on whether the *defendant* knows or should expect that the witness will be called on to testify. *Berardi,* 675 F.2d at 903 n. 18; *Chandler,* 604 F.2d at 975 n. 6; *Hunt,* 400 F.2d at 307–08.

Regardless of the timing of Foster's remarks, Davis knew or should have known that Dillard was a potential witness in the case. His contacting Dillard to discuss their testimony demonstrates this. Therefore, any attempt by Davis to attempt to coerce Dillard or otherwise influence his testimony constituted a violation of § 1503. His actual status as a government witness with immunity from prosecution is irrelevant.

Moreover, the substance of the absent testimony of which Davis complains as to both obstruction of justice counts could have been brought forth by Davis at the time he took the witness stand; no effort was made, however, to elicit testimony from Davis while he was on the witness stand bearing on the obstruction counts.[12] Accordingly, we believe that no substantial prejudice resulted from the lack of Ething-ton's testimony on the obstruction of justice count alleging an attempt to influence a witness. The trial court's denial of Davis' motion to sever the obstruction counts was not an abuse of discretion.

## IV. *Due Process*

■ Davis contends that the behavior of the trial court substantially prejudiced his case and denied him due process of law under the Fifth Amendment. He asserts that the trial court improperly made comments on the weight of the evidence, made objections for the government's attorney, curtailed and impeded cross examination by defense counsel, and conducted the trial in such a way that he was prejudiced by the trial court's hostility and antagonistic attitude toward defense counsel. To constitute constitutional error, however, the trial court's actions, viewed as a whole, must amount to intervention which could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor. *United States v. Abrams,* 568 F.2d 411, 423–24 (5th Cir.), *cert. denied,* 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978) (citing *United States v. Gomez-Rojas,* 507 F.2d 1213, 1223–24 (5th Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975)). In addition, such judicial intervention must be qualitatively and quantitatively substantial to meet this test. *United States v. Robinson,* 687 F.2d 359, 361 (11th Cir.1982).

■ Davis raises seventeen incidents that took place in the presence of the jury to support his contention that the trial judge exhibited a biased attitude against the defense.[13] The exchanges primarily in-

---

12. Davis' tenure on the witness stand was short-lived. He was simply asked by his counsel if he committed the offenses charged, to which he responded in the negative. His cross-examination by the government's attorney consisted of only one question; he was asked whether he had made the phone call to Dillard that the government had recorded, to which he responded in the affirmative.

13. The following excerpt from testimony given by Curtis Hill typifies the conduct and attitude of the trial judge of which Davis complains:

MR. ETHINGTON: Let me show you Exhibit 10 and ask you if you recall that check and the signature on the back of it. I'm just trying to determine whether that is your signature or Dennis Preslar's.

A. Well, the Curtis Hill is definitely not mine. The Dennis Preslar signature looks like his.

Q. You've seen his signature many times?

A. Oh, yes, sir.

Q. You notice this is made out to the order of Curtis Hill, one thousand dollars. It is on the front of it?

A. Yes, sir, it is.

Q. It is towards the end of 1980 is the date on it.

volve interjection into the examination of witnesses by the court, raising, *sua sponte*, the question of relevance, and comments upon the weight of the evidence. Davis cites this Court to our decision in *United States v. Candelaria-Gonzalez*, 547 F.2d 291, 297 (5th Cir.1977), in which disparagement, correction, and interruption of defense counsel, *inter alia*, led to reversal of the conviction. While the record does indicate some tension between the trial judge and Ethington, we do not believe the conduct of the judge rises to the level of a violation of Davis' constitutional rights.

▮▮▮▮ None of the comments of the trial judge, raised by Davis, were directed at Ethington personally; rather, they were directed to the relevancy of the evidence and to expediting the trial. This was entirely proper. The trial court is not required to remain silent and passive. *Candelaria-Gonzalez, supra,* at 297. Moreover, it is the duty of the trial court to facilitate the orderly progress of the trial while maintaining the appearance of strict impartiality. *Id.; Adler v. United States,* 182 F. 464, 472 (C.C.A.La.1910). These excerpts, compiled from a 600 page record, do not implicate judicial conduct amounting to intervention that could have led the jury to a predisposition of Davis' guilt. Further, the court instructed the jury that it was not to assume from any admonishments or

questions posed by the court to counsel or witness that the court had any opinion on the matter and that it should disregard any opinion of his as to the facts. Such a curative instruction militates against any finding of prejudice. We hold that the conduct of the trial court did not so prejudice the defense in the eyes of the jury as to warrant reversal on Fifth Amendment grounds.

## V. *Brady Request*

Davis maintains that the government failed to disclose exculpatory evidence in its possession and thus violated the requisites of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* established that a prosecutor has an affirmative constitutional duty to supply a defendant with exculpatory material known to him or in his possession when such material is specifically requested by the defendant. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court set forth the standard to be applied in situations, as here, where the defendant fails to request, or only generally requests, exculpatory evidence from the government.[14] In such cases, the Court stated, reversal is necessary only "if the omitted evidence creates a reasonable doubt [as to the defendant's guilt] that did

---

THE COURT: Why don't you offer it before it is testified about?

MR. ETHINGTON: I want to establish time frame so it fits.

THE COURT: It will show the time frame if the foundation has been laid.

MR. ETHINGTON: We offer Exhibit 10 into evidence, Your Honor.

MR. WILLIAMSON: There is no relevance to this at all. It is just some check.

THE COURT: I don't see particularly since he said this is not his signature.

BY THE COURT:

Q. Is this the first time you have seen that document or a copy of it?

A. Yes, sir.

THE COURT: I'll sustain.

MR. ETHINGTON: Our purpose is, Your Honor, there are some documents here that have Curtis Hill's name on it, and it may not be his signature.

MR. WILLIAMSON: The way to do that is to ask him about the documents.

MR. ETHINGTON: I don't need a lecture from the prosecutor.

THE COURT: I don't need any argument from either of you, but the foundation hasn't been laid for the introduction of that as an exhibit is the simple answer to it. And I don't see the relevance. I don't see the relevance if that were used for the purpose of showing that that is not his signature. He already stated it is not his signature.

MR. ETHINGTON: Our purpose is to demonstrate that Dennis Presler looks like from time to time is signing his name, and he may not have known about it. That is the relevancy of it, Your Honor.

THE COURT: I don't see that that is relevant at this stage.

**14.** Davis made no specific request. His inquiry was a "general" *Brady* request, asking the prosecution for any and all exculpatory materials in its possession.

not otherwise exist." *Id.* at 112, 96 S.Ct. at 2402. The Court further explained that the materiality of the omitted evidence "must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Agurs, supra,* at 112–13, 96 S.Ct. at 2402 (note omitted).

 There are no grounds for reversible error on this point. Davis, in his brief on appeal, fails to establish the existence of any exculpatory evidence. Indeed, he impliedly admits the absence of any such exculpatory evidence when he asserts, "although it is impossible to state with certainty, [Davis] contends that many of the voluminous documents ... reflect that [Davis] was not involved in the scheme to defraud carried out by Hill...." This vague contention fails to satisfy the standard for reversal required by *Agurs.*

 Davis merely sought to conduct a fishing expedition for exculpatory material. The government is correct in asserting that the court is simply not required to ensure access to all government material in order that he might be able to find something exculpatory for his case. *United States v. Arroyo-Angulo,* 580 F.2d 1137, 1144 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978); *see also United States v. Bland,* 432 F.2d 96, 97 (5th Cir. 1970), *cert. denied,* 401 U.S. 912, 91 S.Ct. 877, 27 L.Ed.2d 810 (1971). The interests of judicial economy militate against granting such open ended requests, absent a constitutional basis that compels such access. Davis' generalized *Brady* request was properly refused by the trial court.

Our review of the record indicates no infirmities in the jury's findings. Nor do we find fault with the rulings or conduct of the trial court. Accordingly, the judgment of the trial court is AFFIRMED.